UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

KYLE LAMAR PASCHAL-BARROS   :     CIVIL NO. 3:18CV02157 (VLB)

    v.                          :

SCOTT SEMPLE, ET AL.         :     SEPTEMBER 4, 2019

## DEFENDANTS LOCAL RULE 56 (a) 1
## STATEMENT OF UNDISPUTED MATERIAL FACTS

The defendants hereby reply submit their Local Rule 56 (a) 1 Statement of undisputed material facts.

1.     Administrative segregation (AS) is a restrictive housing status that results in segregation of an inmate whose behavior or management factors pose a threat to the security of the facility or a risk to the safety of staff or other inmates such that the inmate cannot be safely managed in general population. (Ex. 1, Maiga Declaration ¶2).

2.     The AS program is established by Department of Correction (DOC) Administrate Directive 9.4. It is a phased program authorized at Northern Correctional Institution (NCI), Garner Correctional Institution (GCI), and other select correctional institutions identified in AD 9.4.12. (Id. ¶3).

3.     The AS program is a Transitional Phase Program. There are three phases that inmates must complete before any recommendation is made by the Unit Administrator for return into general population. The entire program shall at a minimum be a 10-month period. Phase I of the program is held at NCI. The AS program is divided into three phases, each phase being a progressive relaxation

of restriction on the inmate and he or she demonstrates progresses toward a return to general population. (Robles Declaration, Doc. 25-1, ¶6).

4.      The AS program at NCI operates on the basic assumption that inmates who engage in aggressive, violent, disruptive behavior, or who pose an imminent risk to the public, staff, or other inmates require a highly structured and secure environment. Within this environment, inmates are held accountable for their action while learning coping skills necessary to allow their safe return to general population. (Id. ¶7).

5.      Phase I of AS at NCI is the beginning phase of the AS program. This portion of the program is a minimum of 120 days before any review for progression to Phase 2. The program restrictions and privileges at NCI are as follows:

> a. Inmates are removed from their cells in full restraints, including handcuffs, leg irons, and security tether chain, except for showers when the tether chain is not used.
>
> b. Inmates are allowed to spend a maximum of $25.00 per week for commissary items.
>
> c.  Inmates are allowed one 15-minute telephone call per week.
>
> d. Inmates are allowed one 30-minute non-contact visit per week with immediate family.
>
> e. Inmates receive recreation one hour per day five days a week.
>
> f. Inmates receive three showers per week.

    g.  Inmates are allowed a radio and headphones in cell.

    h.  All meals are served inside the cell.

(Id. ¶8).

6.    Inmates in the AS program may progress to Phase 2 and then onto Phase 3 where the specific elements of the program differ. Inmates in Phase 2 and Phase 3 have different restraint rules when out of cell up to and including no restraints at all, receive more generous visitation, telephone, and commissary privileges. Progress to Phase 2 may occur after 120 days in Phase 1 with the last 60 days being free of disciplinary offenses and provided they have demonstrated a positive attitude. (Id. ¶9).

7.    Progression from Phase 1 is determined by a collaborative team consisting of the warden, a deputy warden, the inmate's unit manager, a counselor, a counselor supervisor, a member of the mental health staff, and an officer from the inmate's housing unit.  (Id. ¶10).

8.    Criteria exist for an inmate to be returned to Phase 1 or Phase 2 as follows:

    a.  Criteria for return to Phase I from Phase II:

        i.  Class "A" or Class "B" disciplinary report.

        ii.  Class "C" multiple disciplinary reports.

        iii.  Punitive Segregation received as a sanction on a disciplinary report.

        iv.  Refusal to participate in any Phase II Programming.

3

        **v.**   **Poor attitude or lack of motivation.**

**(Id. ¶11).**

     **9.**    **Placement of an inmate on AS is at the discretion of the Director of Offender Classification and Population Management in accordance with AD 9.4. An inmate is not placed in AS without notice and a hearing. (Ex. 1, Maiga Declaration ¶4).**

     **10.**   **On December 8, 2016 the Warden Falcone at GCI requested that Plaintiff be considered for AS placement. The reason for the request was that December 5, 2016 Plaintiff assaulted a correctional officer, was combative with officers, and attempted to assault an officer. He was also disruptive and assaultive in a prior incident on November 19, 2016, when he threw an unknown liquid substance striking an officer in the face and threatened him saying "I am going to keep throwing shit on you every time I see you." He had been housed in the facility restricted housing unit since June 29, 2016 where he was disruptive on a continual basis and refused to comply with staff direction and made continuous threats to assault staff. He accumulated 23 disciplinary reports between April 15, 2016 and December 8, 2016. (Id. ¶5).**

     **11.**   **Paschal was provided proper notice of the hearing for AS placement on January 9, 2017. (Id. ¶6).**

     **12.**   **On January 13, 2017 a hearing was held to consider placement of Paschal in AS. He refused to leave his cell to attend the hearing. Based on the evidence provided by Warden Falcone and the Incident Report of the December 5,**

2016 incident, the hearing officer recommended placement in AS. The Director of Offender Classification and Population Management reviewed the recommendation and authorized Paschal's placement in AS on January 17, 2017. (Id. ¶7).

13.     Paschal has remained in the AS program since January, 2017. He progressed to Phase 2 at Walker Correctional Institution on May 2, 2018 and while there progressed to Phase 3. However, he regressed to Phase 1 and was returned to NCI on October 1, 2018. On July 2, 2109 he progressed to Phase 2 at GCI, where he remains in the AS program. (Id. ¶8).

14.     Defendant Lalitha Pieri is a psychologist at GCI since 2009. She is familiar with the Plaintiff and participated in his mental health care at GCI in 2016 and 2017. (Ex. 2, Pieri Declaration, ¶¶1-2).

15.     Prior to October 2016 Plaintiff was moved the prison restricted housing unit (RHU) at GCI, which requires review of his mental health status every thirty days. (Id. ¶3)

16.     On October 3, 2016 Pieri met with plaintiff to review his placement in the RHU. He presented as irritable but in behavioral control. She assessed his agitation as related to his perception of injustice and cognitive distortion rather than RHU placement, which placement did not appear to adversely affect any serious mental illness. (Id. ¶4).

17.     On October 5, 2016 he was seen by the psychiatric Advanced Practice Registered Nurse (APRN) who recorded that he was calm, neatly

5

groomed, cooperative, with normal speech and appropriate affect. He was organized and future orientated and denied suicidal ideation (SI), homicidal ideation (HI), auditory hallucinations (AH), and visual hallucinations (VH). He denied paranoia and had no overt delusions. The APRN diagnosed post-traumatic stress disorder (PTSD), Mood Disorder not otherwise specified (NOS), Attention Deficit Hyperactivity Disorder (ADHD) by history, and Bipolar Disorder (BPD). He agreed to a trial of Prozac and Vistaril, an anti-anxiety medication. (Id. ¶5).

18.    Pieri next saw Plaintiff on November 4, 2016 for a thirty day RHU review. He had been yelling and causing a disturbance earlier but when she saw him he was cooperative. His speech was somewhat pressured but it appeared to be his baseline. He presented in a contradictory manner, expressing interest in reforming his behavior but dismissive when his maladaptive behaviors were pointed out. Pieri assessed that his RHU placement did not adversely affect any serious mental illness.  (Id. ¶6).

19.    Later that night (November 4, 2016) Plaintiff refused to comply with staff orders and covered his cell window. Correctional staff was required to use chemical agent and extract him from his cell and he was placed on in-cell restraints. He denied SI/HI/AH/VH. A Licensed Clinical Social Worker reviewed his situation and concluded that BOS was not necessary and that issuance of a disciplinary report would not cause an acute symptom of serious mental illness. (Id. ¶7).

20.     On December 6, 2016 Pieri saw Plaintiff after an incident in which he covered his cell window, threatened staff, and spit at staff. That incident occurred on December 5, 2016 (Ex. 7, Medical Chart, #1129-30). Plaintiff was on in-cell restraints when Pieri saw him. He was calm but irritable with an angry affect. He was on BOS for safety although he denied SI and HI. He claimed that he did not understand why he was on restraints or remember what happened but he was observed speaking calmly to another inmate about the underlying incident. Pieri assessed that he was not at risk for self-harm and she discontinued BOS. (Ex. 2, Pieri Declaration ¶8).

21.     Pieri saw Plaintiff again on December 7, 2016.  She met with him to assess his appropriateness for participation in the DOC disciplinary process. He had received a disciplinary report for a threat he made to throw urine on the next mental health staff that came to see him. He was calm, organized, and coherent. He did not present any safety concerns or serious mental illness. He reported a history of PTSD but appeared to use reported symptoms of flashbacks and nightmares to get his needs meet. He had not participated in treatment in any meaningful way. His acting out behavior was assessed as motivated by antisocial concerns such as entitlement, externalization of blame, and retribution rather than trauma. (Id. ¶9).

22.     On December 14, 2016 Pieri conducted a Mental Health Assessment of Plaintiff as part of her clinical evaluation of him for possible transfer to administrative segregation at Northern Correctional Institution (NCI). She also

completed a detailed Mental Health Assessment of plaintiff. He denied suicidality and was cooperative with the assessment and evaluation. In her clinical record note she recorded that he had been housed in the Restricted Housing Unit (RHU) at GCI since June, 2016 as a result of repeated disciplinary violations including threats, attempted assaults on DOC staff, interfering with safety and security (ISS), and assault on DOC staff. Despite efforts to reduce his punitive segregation (PS) time in RHU he continued in antisocial acting out. She noted that he endorsed symptoms of PTSD but that his behavior was motivated primarily by antisocial personality disorder (ASPD). She noted that he may experience symptoms of PTSD but they had not been observed to be at a significant degree. She concluded that from a mental health standpoint he was clear for participation in the administrative segregation program at NCI because his behaviors appeared to be motivated by an antisocial agenda rather than symptoms of a serious mental illness, such as PTSD. (Id. ¶10).

23.    On January 9, 2017 Plaintiff was involved in a Code Purple. He was found in his cell with something tied around his neck. He was assessed by the second shift social worker as having made a suicidal gesture with further statement of intent to self-harm requiring a higher level of care to protect him from himself. The on-call psychiatrist, Dr. Zahedi, ordered his transfer to the in-patient medical unit on 15-minute observation. (Id. ¶11).

24.    On January 10, 2017 Defendant Chiman Patel, a psychiatrist at GCI, assessed Plaintiff in the in-patient unit at GCI. He was accompanied by Dr. Pieri.

He reviewed Paschal's chart before meeting with him, including the recent code purple and medications.  Paschal was alert, oriented to time, place and person, and had no psychomotor agitation. He was anxious and angry secondary to incarceration, stress related to family issues, and a history of past sexual abuse as a child. Past diagnoses in his chart included multiple emotional disorders including post-traumatic stress disorder (PTSD), mood disorder not otherwise specified, attention deficit hyperactivity disorder (ADHD), and borderline personality disorder. No psychotic or depressive symptoms were observed but anger, frustration, and anxiety were present, suggesting a primary diagnosis of a personality disorder. Dr. Patel continued his 15 minute staggered observation and medications (Ex. 3, Patel Declaration ¶¶1-4).

25.     On January 11, 2017 Patel conducted a clinical assessment and medication review of Plaintiff. Paschal stated that he was feeling suicidal but had no plan for self-harm. Patel assessed that that he was displaying borderline personality behavior. He continued Paschal's 15-minute observation status in the in-patient unit (Id. ¶5).

26.     Pieri also saw Plaintiff on January 11, 2017. He was concerned that the warden wanted to send him to administrative segregation (AS) at NCI. He reported depression and suicidal thoughts but he was future oriented and spoke in a confident manner. He was alert and had good eye contact. She assessed his behavior in the code purple incident the day before as motivated by secondary gain to avoid transfer to AS. She concluded that he did not require in-patient

admission and planned to discuss his possible discharge from the in-patient unit and return to RHU with his mental health team. (Ex. 2, Pieri Declaration ¶12).

27. Patel saw Paschal again in January 12, 2017 in the in-patient unit. He reviewed his clinical course with the mental health and medical staff.  Paschal was compliant with medications and had no complaints. His case was discussed with the clinical team and it was decided that he did not require in-patient level care. Patel discharged plaintiff from the in-patient unit back to RHU on Behavioral Observation Status (BOS) because housing unit BOS provides for 15-minute observation and adequate monitoring as a step down from in-patient admission. He also reduced Plaintiff's mental health classification score from level 5, which requires in-patient housing, to level 3 because he was not acutely suicidal and did not require in-patient housing. (Ex. 3, Patel Declaration ¶6). Patel had no further connection to Plaintiff's care in January 2017, and Plaintiff was transferred to another correctional institution the next day. (Id. ¶7).

28.   Pieri saw Plaintiff again on January 13, 2017 in RHU. She offered psychological testing for the purpose of mental health treatment planning. She advised him that he was being transferred to AS and the testing was not a condition of transfer. He was mute and lightly tapped his head on his cell door. She tried a second time to discuss testing but he only stared at her and remained mute. She assessed that he was engaging in behavior to avoid placement in AS. His conduct at the cell door was atypical for him and the timing in conjunction

10

with notice of AS transfer was highly suspicious and suggested that he was motivated to avoid AS. (Ex. 2, Pieri Declaration ¶13).

29.     On January 13, 2017 Pieri spoke to mental health staff at NCI and advised that Paschal was being transferred to NCI on BOS. (Id, ¶14). She had no further involvement in Paschal's treatment in 2017 and he was transferred to NCI on January 13, 2017 (Id. ¶15).

30.     Prior to his placement on AS in January 2017, plaintiff had accumulated 63 disciplinary reports. As of March 1, 2019 he had accumulated a total 110 adjudicated disciplinary reports. The majority of the disciplinary reports were for interference with safety and security, totaling 50. However, he has also received 28 disciplinary reports for making threats, 8 for assault of DOC employees, and 6 for fighting. The other disciplinary reports he has received include Impeding Order, Disobeying a Direct order, Insulting language, Destruction of Property, Flagrant Disobedience, Causing a Disruption, and Public Indecency.  (Robles Declaration, Doc. 25-1 ¶18).

31.     Defendant Frayne is a psychologist employed by the State of Connecticut. He was assigned to NCI in 2017 through May 30, 2018. He is familiar with the Plaintiff and participated in his mental health care at NCI in 2017 and 2018. He first saw Plaintiff at NCI on January 17, 2017. Paschal was in the In-Patient Unit on Behavioral Observation Status (BOS). Frayne interviewed him and performed a mental health evaluation and suicide risk assessment in order to determine if he was appropriate for discharge from BOS and transfer to

administrative segregation unit housing. Plaintiff had made a safe adjustment to the facility and was future oriented by expressing a desire to work on modifying his criminal sentence and improving his legal situation. (Ex. 4, Frayne Declaration ¶¶1-3).

32.     Defendant Gagne is a psychiatrist employed by the State of Connecticut. He was assigned to NCI in 2017 through part of August 2018. He is familiar with the Plaintiff and participated in his mental health care at NCI in 2017. He first saw Plaintiff at NCI on January 17, 2017. Paschal was in the In-Patient Unit on Behavioral Observation Status (BOS). Gagne completed an Initial Psychatric Evaluation of Paschal and saw him in the in-patient unit. Paschal had a variety of past diagnoses by history including post-traumatic stress disorder (PTSD), mood disorder, borderline personality disorder, and attention deficit hyperactivity disorder (ADHD). He was on a variety of medications including antipsychotics, anti-depressants, and drugs used to treat ADHD and PTSD. Gagne reviewed his history and his extensive disciplinary record while incarcerated. He was casually groomed and his thought process was logical and linear. He denied suicidal ideation (SI), homicidal ideation (HI), auditory hallucinations (AH) and visual hallucinations (VH). His judgment and insight were intact. Gagne assessed that it was unclear if his history of diagnosis with ADHD and PTSD was currently active, and he told Paschal that those diagnoses were made at least eight years prior and he was not sure they were "forever diagnoses" or that medication for them was "forever." Gagne encouraged

Paschal to engage with the START NOW cognitive programming offered in AS. He assessed that Paschal was stable and he discharged him from BOS and in-patient medical. (Ex. 5, Gagne Declaration ¶¶1-3).

33.     Plaintiff then was seen by mental health staff on the next five consecutive days.  He reported that he was doing well, no distress was noted, and he was stable in his transition to NCI. He also accepted the Start Now programming package, which is a cognitive behavioral therapy program designed to assist inmates in recognizing their thinking errors, regulating emotions, address their anger, problem solve more effectively, manage interpersonal skills, and adjust to their environment.  (Ex. 4, Frayne Declaration ¶4).

34. The Start Now program is the standard cognitive programming for inmates in the State of Connecticut. It was used at NCI for individual in cell study and in small groups of three AS inmates in the visiting area of the 1 west housing unit that was specially modified to allow small group discussion with mental health staff.  (Id. ¶5).

35.  On February 28, 2017 Paschal was seen by Dr. Gagne. He reported no disciplinary issues since Gagne saw him on January 17, 2017. He had an upcoming court date and he told Gagne that he was not worried about it. He was eating and sleeping well and was engaged in appropriate socialization during recreation. He was casually groomed with good eye contact and his thoughts continued to be logical and linear and his judgment and insight were intact. Gagne encouraged him to continue to engage therapy. He assessed him as stable

and continued his medications as previously ordered.  (Ex. 5, Gagne Declaration ¶4).

36.    On March 6, 2017 Paschal was seen in a private face to face session by a licensed clinical social worker (LCSW). He claimed that other inmates were threatening him but that he was working with the unit captain to address the issue. He was assessed as future oriented and motivated for treatment. (Ex. 4, Frayne Declaration ¶7).

37.    On March 7, 2017 the Director of Psychological Services for inmate mental health care in the state, Paul Chaplin, came to NCI and met with and assessed Paschal. He reviewed Paschal's chart in connection a mental health assessment he performed, completed a suicide risk assessment, wrote a detailed clinical chart note, and administered a Personality Assessment Inventory, all as part of a comprehensive evaluation of Plaintiff. (Ex. 6, Chaplain Declaration ¶¶1-4).

38. On March 7, 2017 Chaplin noted Plaintiff's history and a recent incident in which he was found lying on the floor of a cell with a noose around his neck. He completed a mental status exam. Paschal had no suicidal ideation, was organized in thought process, and was oriented to time place, person, and purpose. He was cooperative and reported eating three meals a day and sleeping eight hours each night. Chaplin diagnosed him as having an antisocial personality disorder (ASPD) and noted that if he had post-traumatic stress

14

disorder (PTSD) it was mild. He had a low frustration level that led to his acting out. (Id, ¶5).

39. On March 7, 2017 Chaplin also completed a Suicide Risk Assessment of Plaintiff. It included a thorough review of relevant acute risk factors and long term risk factors, as well as other factors properly included in a suicide risk assessment. He determined that paschal was, at that time, at low imminent risk for a potentially serious lethal suicide attempt. (Id. ¶6).

40. On March 7, 2017 Chaplin also wrote a detained Clinical Record note regarding his assessment and testing of Plaintiff with respect to his placement in administrative segregation. He noted that Paschal was clearly not depressed, denied suicidal ideation, and was pleasant and cooperative. Chaplin confirmed his diagnosis of ASPD with borderline traits and perhaps PTSD, but if present it was mild.  (Id. ¶7).

41.  On March 7, 2017 Chaplin also administered a Personality Assessment Inventory to Plaintiff, which is a self-reporting assessment tool that is scored by a computer software program. The program also generates a report that may be of assistance in diagnosis or treatment of a patient. Chaplin reviewed the Clinical Interpretative Report generated by the software program. It notes at page 8 that Plaintiff reported recurrent suicidal thoughts at a level typical of individuals placed on suicide precautions, that the potential for suicide should be evaluated immediately, and that careful follow-up regarding suicidal thoughts or potential behavior was warranted. In fact, Chaplin completed a careful and exhaustive

suicidal assessment the same day that the self-report assessment was completed and Plaintiff did not require suicidal precautions. The assessment tool may be a helpful adjunct to a personal evaluation and assessment but the face to face evaluation and assessment Chaplin conducted on March 7, 2017 was a valid and irreplaceable method to assess risk and a better predictors of risk. (Id. ¶8).

42. On March 8, 2017 Chaplin completed a Mental Health Evaluation Form for Placement in Administrative Segregation Housing. In it he confirmed that Plaintiff was assessed in a face to face interview, that he had reviewed Paschal's newly completed mental health intake form, custody data about him, and his medical and mental health file, and that he was cleared for placement in administrative programing housing. (Id. ¶9).

43. On March 19, 2019 Paschal was seen by a LCSW in a private 1:1 therapeutic meeting. (Ex. 4, Frayne Declaration ¶9).

44. On April 5, 2017 the LCSW met with Paschal who was experiencing racing thoughts. Discussion enabled Paschal to stabilize and the LCSW assed him as stable without suicidal or homicidal ideation. (Id. ¶10).

45. On May 16, 2017 Paschal was again seen by Dr. Gagne. He was casually groomed, made good eye contact, his thoughts were linear, logical, and future oriented. He told Dr. Gagne that he was stressed but denied suicidal or homicidal ideation. Dr. Gagne continued Paschal on the medications previously ordered.  (Ex. 5, Gagne Declaration ¶5).

46.     On May 24, 2017 Paschal was seen in a private face to face session by a LCSW. He told clinician that "things are better" and demonstrated that he was future oriented by telling the clinician that he was pursuing legal charges against correctional staff and a reconsideration of his sentence due to ineffective assistance of counsel. He also told the clinician that he had stopped taking his mental health medications because he felt they did not do anything. He was assessed as future focused and stable and in good emotional control. (Ex. 4, Frayne Declaration ¶12).

47.     In the evening of June 10, 2017 Paschal was placed in the medical unit on Behavioral Observation Status (BOS) after he made statement that the CIA was going to assassinate him. He was seen by mental health staff the next morning and he denied any suicidal or homicidal ideation and any auditory or visual hallucinations. He told the clinician that he had not slept for four days. The clinician assessed that Paschal did not appear frightened. He was seen again later that day by the same clinician who observed that Paschal "slept/rested under blanket the entire shift." (Id. ¶13).

48.     On June 12, 2017 Frayne assessed Paschal in the medical unit. He told Frayne that he had been sleep deprived and that disrupted his mental status. He was oriented to person, place, and location. He denied any risk factors linked to self-injury or assaulting otters. Frayne discharged him from BOS and he was seen and assessed by mental health staff on each of the next five days. (Id. ¶14).

49.    On June 22, 2017 Paschal was seen by a LCSW in a face to face private session. He told the clinician that he wanted his habeas corpus and thought he may be discharged from incarceration in one year. They discussed his staying in control of his emotions and using the Start Now program skills when he experienced a crisis. He was assessed as stable, in very good control, future oriented, and hopeful. (Id. ¶15).

50.    On June 28, 2017 Paschal was seen again by Dr. Gagne pursuant to a medication referral related to his consistent refusal to take medication. He told Gagne that he did not like his medications and did not want them anymore. He discussed his habeas legal case and his belief that he would be discharged from incarceration "next year." He was participating in recreation and we explored coping mechanisms. He was casually groomed and made good eye contact. His thought process continued to be logical, linear and future oriented. He told Gagne that he gets anxious sometimes. He denied SI/HI and his judgment and insight were intact. He refused any further psychiatric medications. Gagne assessed that his behavior and presentations were essentially the same when he was taking the medications as when he was refusing them and it appeared that his maladaptive behaviors were associated with a personality disorder rather than PTSD or ADHD. Gagne entered physician's orders discontinuing his psychiatric medications and scheduled him for regular ninety day follow-up. (Ex. 5, Gagne Declaration ¶6).

51.    On June 28, 2017, after Paschal was seen by Dr. Gagne, Frayne observed him with a tee shirt tied around his neck. He was in no distress. His

conduct was not a serious suicide attempt but rather was a maladaptive behavior intended to unnerve Frayne and gain attention because his neighbor was also engaging in self-injurious maladaptive behavior. Paschal was defensive and agitated when Frayne confronted him about his behavior. As a result Frayne decided to place him on BOS in the medical unit. (Ex. 4, Frayne Declaration ¶17).

52.     On June 29, 2017 Frayne spoke with Paschal in the medical examination room. He was needy and demanding. He calmed down and listened to Frayne's reasoning about his character pathology, which in Frayne's view was borderline personality disorder. Frayne continued him on BOS. (Id. ¶18).

53.     On June 30, 2017 Frayne assessed Paschal again. He accepted responsibility for his behavior and demonstrated improved self-control. Frayne discharged him from BOS and he returned to his normal housing. He was then followed by mental health staff on July1, July 2, July 3 and July 5, 2017. He was assessed as stable on each occasion and discussed the Start Now cognitive program with his LCSW on July 5, 2017. (Id. ¶19).

54.     On July 18, 2107 Paschal met privately with a LCSW. He discussed his daughter and advised that he had recently made a legal change of name. He demonstrated very good control and was future oriented. (Id. ¶20).

55.     Paschal met with the LCSW again on August 14, 2017. He reported that he was pleased with recent loss of weight. He requested some relaxation and self-soothing techniques. He advised that he was reading a new Harry Potter

book and was working on his appeal and legal work.  He was future oriented, motivated and in good control.  (Id. ¶21).

56. Paschal was seen by Dr. Gagne on September 12, 2017. Gagne reviewed his chart and discussed medication. Paschal was ambivalent about resuming medication. He advised that he spent his time watching TV, reading, working on his legal matters and working out in his cell. He described himself as depressed about being in prison but he spoke optimistically about his court case. They explored his coping mechanisms. He was casually groomed, his thought process was linear and logical, and he was future oriented. He denied SI and HI and his judgment and insight were intact. His statement of feeling depressed and angry was appropriate to his circumstances. Gagne suggested off-label use of some medication but Paschal remained ambivalent and would not commit to medication. Gagne encouraged him to engage with the Start Now cognitive programming at NCI. Further follow-up with Dr. Gagne was not planned as Plaintiff was no longer on psychiatric medication. After September 12, 2017 Gagne had no further doctor-patient contact with Plaintiff. The treatment Gagne provided for Paschal was appropriate and was based on individualized assessment. Paschal's most significant emotional disorder was his personality disorder. Medications are not necessary to treat personality disorder related maladaptive behavior, which are better managed with strict rules regarding behavior in a controlled environment and cognitive therapy such as the DOC Start Now program. (Ex. 5, Gagne Declaration ¶7-9).

57.    On September 22, 2019 Paschal met with mental health staff in a private 1:1 session. He asked if he could join the Start Now group programming. He was cooperative and alert. His speech was clear. He denied and suicidal or homicidal ideation or any auditory or visual hallucinations. He discussed the group therapy program and his coping skills. He was assessed and having no acute mental health concerns and a plan was made for him to join the next NCI Start Now group program session. (Ex. 4, Frayne Declaration ¶23).

58.    On October 23, 2017 he was seen by a LCSW and was stable. (Id. ¶24).

59.    Frayne saw Paschal again on November 2, 2017. He asked about transferring to Whiting Forensic Institute at Connecticut Valley Hospital. He made reference to a statute but was not listening when Frayne answered him. He presented as extremely needy and Frayne assessed him with borderline personality disorder. Frayne contacted the Department of Mental Health and Addiction Services (DMHAS) and was advised that Paschal was not a candidate for transfer to DMHAS or Whiting. (Id. ¶25).

60.    On December 14, 2017 Paschal covered his cell window and would not answer questions about his mental state. He was placed on BOS. On December 15, 2017 Frayne attempted to asses him but he became frustrated and lied about the event the day before and again covered his cell window. Frayne assessed him as having a significant borderline personality disorder. On December 18, 2017 Frayne assessed him in the medical screening room in his

21

housing unit. He was cooperative and in good control and eager to return to his regular housing. Frayne determined that he was stable and he discontinued BOS. (Id. ¶26).

61.     Paschal was followed by mental health staff on December 19th, December 20th, and December 22nd, 2017. He denied SI and HI and was observed in good spirits by Frayne on December 22, 2017. (Id. ¶27).

62.     On January 18, 2018 a clinical social worker met with Plaintiff. He was impulsive but alert with a calm and lucid presentation. He advised that he reads books sand works out and was having difficulty managing symptoms, issues, and stressors. The clinician reviewed stress management techniques, discussed managing anger, and went over healthy coping. He engaged well and was somewhat receptive to the clinician's suggestion and talk therapy. (Id. ¶28).

63.     On March 2, 2018 Plaintiff told staff he swallowed a razor blade. He was placed on BOS in a dry cell so that his waste could be examined to locate the razor. He refused x-ray to identity the razor. He was alternatively loud and defiant, calm and quiet, but generally uncooperative and remained in the in-patient unit over a period of days. On March 5, 2018 he offered to give up the razor if he was given cookies, peanut butter and Jamaican beef patties. He was stable. On March 8, 2018 his bowel movement was on the floor of his cell and custody officers examined it but found no razor blade. He eventually submitted to an x-ray and on March 9, 2018 Frayne met with him in the medical unit. He denied suicidal ideation, plan or intent and was manipulative but stable. Frayne discharged him

from BOS. He was then followed by mental health staff on March 11, 2018. He was calm, cooperative, appropriate, and stable. He told the clinician that he was making a list of books he wanted to order. He was seen again on March 12, 2018 and March 16, 2018 by a LCSW and was assessed as stable. (Id. ¶29).

64.    On March 28, 2018 Plaintiff reported to medical staff that he pulled a muscle in his lower back while doing lunges. The fact that he was exercising was an indication that he was stable and future oriented. (Id. ¶30).

65.    Paschal was assessed again by a LCSW on Aril 20, 2018. He discussed his positive outlook and his ability to remain focused on a plan to leave NCI by progressing to AS Phase 2. They discussed family dynamics and his inability to maintain healthy boundaries at times. He was assessed as stable with a good mood, alert, and with no SI/HI intent. (Id. ¶31).

66.    Paschal was transferred out of NCI on May 2, 2018 and Frayne has had no further interaction with him and has no continuing professional relationship with him. (Id. ¶32).

67.    When Plaintiff was housed in the AS program at NCI his metal cell door was kept locked when he was inside. (Robles Declaration, Doc. 25-1 ¶19).

68.    Plaintiff's cell had a button which he could activate at any time which connects him via intercom to the control pod of his housing unit. The control pod was staffed 24 hours a day, 7 days a week with a correctional officer. (Id. ¶20).

69. There is a trap door located on the cell door. The trap door could be opened and closed. (Id. ¶21).

70. Plaintiff was able to speak to other inmates through crevices alongside the cell door, and through the vent in the cell wall and the unit manager witnessed inmates speaking with other inmates through crevices alongside the cell door and through the vents in the cell wall. It was a common occurrence on 1 West at NCI where Plaintiff was housed. (Id. ¶22-23).

71. Correctional Officers toured 1 West every fifteen minutes, 24 hours a day, seven days each week. (Id.¶24)

72. During tours it was required that the officers look inside of each cell and actually view the inmate who is inside. (Id. ¶25).

73. This is done to ensure the safety and security of the inmates, the officers, and the facility. (Id. ¶26).

74. A lieutenant toured 1 West twice during each shift for a total of six lieutenant tours per day. (Id. ¶27).

75. The unit manager toured 1 West once daily, Monday through Friday, at a minimum. (Id. ¶28).

76. A deputy warden toured the unit twice each week. (Id. ¶30).

77. The Warden toured the unit twice each week. (Id. ¶31).

78. Each of the individuals touring the unit was available to speak with plaintiff during these tours. (Id. ¶32).

79. In addition, the NCI Chaplains schedule, at a minimum, weekly visits to inmates on AS Phase I. Additional visits were available at the request of an inmate on Phase 1. (Id. ¶33).

80. Plaintiff's cell was searched on a random basis but not less frequently than three times every seven days or more frequently when warranted. During those searches plaintiff was removed from his cell and was escorted to a shower where he is secured until the cell search is completed, at which time he was escorted back to his cell. During the cell search process and escorts Plaintiff had multiple face-to-face contacts with correctional staff. (Id. ¶34).

81. Plaintiff was permitted 3 showers per week. Showers toke place outside of his cell and require escort by correctional staff, during which time plaintiff has direct face-to-face contact with the escorting officers. (Id. ¶35).

82. Plaintiff was permitted one hour of recreation time per day, five days a week in a controlled area. Recreation took place in one of two outdoor recreation yards in the 1 west housing unit. Each outdoor recreation yard has multiple screened enclosures. The screened areas in each yard are adjacent to each other, allowing the inmates to view and speak with one another. Each screened area was locked. When Paschal was outdoors for recreation he usually had other inmates in the adjacent enclosures and he is able to see and speak with them. (Id. 36)

83. Inmates were able to engage in a variety of activities while in this screened area, including walking or running in place, calisthenics, and stretching exercises. (Id. ¶37).

84. If plaintiff has a question or complaint he could bring it to the attention of the appropriate staff member verbally, when that staff member was in the

housing unit, or he could address a written inmate request form to the appropriate staff member. (Id. ¶38).

85.  Plaintiff was also afforded the opportunity to utilize the administrative remedy program, including grievances and health issues, by submitting an Inmate Administrative Remedy request in accordance DOC Administrate Directive 9.6 or 8.9, depending on the particular nature of his issue. (Id. ¶39).

86. Plaintiff's cell contained two bunks but he occupies the cell without a cellmate. The cell had one mattress, linens, one desk with attached stool, one sink with hot and cold running water controlled by the inmate, and a toilet. The cell had a reflective steel plate mounted to the wall above the sink which functioned as a mirror. The cell had two light fixtures which the inmate may control from within his cell. (Id. ¶40).

87. Plaintiff was allowed to keep books, papers, and a writing utensil, in his cell. He was also allowed to keep personal hygiene items in his cell as well as items purchased from the commissary, but such items could not exceed two cubic feet. Paschal meet the DOC definition of an indigent inmate and therefore DOC provided him with a care package every week consisting of soap, deodorant, shampoo, toothbrush, toothpaste and napkin. He was also regularly provided with toilet paper. DOC also provided him with two free social envelopes each week, five free legal envelopes every month, and twenty free sheets of paper each month. Delivery of these items was usually by face to face encounter with Plaintiff. (Id. ¶41).

88. **Plaintiff was allowed to have a radio and headphones in his cell. (Id.¶42).**

90. **Plaintiff was permitted professional legal visits as needed and approved by Unit Administrator or designee. (Id. ¶43).**

91. **Plaintiff was permitted to send and receive mail the same as general population but was limited to five letters in his cell at a given time. (Id. ¶44).**

92. **After Paschal's regression to AS Phase 1 in October 2018 his principal medication prescribing authority at NCI was APRN Reischerl. (Reischerl Declaration, Doc. 25-2 ¶1-2).**

93. **APRN Reischerl agrees with Pieri, Frayne, Gagne, and Chaplin that Plaintiff's most significant mental health issue is his personality disorder and that while elements of post-traumatic stress disorder or other disorders may be present, the overwhelming mental health issue is a personality disorder. (Id. ¶4).**

93. **After his regression to NCI on October, 2018, Plaintiff had an intensive number of contacts with mental health staff who assessed and treated him, which shows that he was not isolated in solitary confinement. They included the following:**

- **10/2/18: psychologist Leonard Santarsiero, PhD;**

- **10/9/18: Aimee Chofay, RN. Plaintiff reported to her that he was "doing OK.";**

- **10/10/18: William Longo, Licensed Professional Counselor (LPC), who reported the plaintiff was agitated over his regression to Phase 1;**

- **11/5/18: Robert Waddington RN who saw plaintiff regarding abdominal pain;**

- **11/21/18: LPC Longo who saw Paschal at the prisoner's request due to stress and recorded that Paschal was coping well with no suicidal or homicidal ideation (SI/HI).**

- **11/23/18: Andrea Reischerl, APRN, to whom plaintiff complained of lack of sleep. Paschal reported his depression was a 3 on a scale of 10 and he denied SI/HI;**

- **11/29/18: Sara Cyr, LCSW, due to Paschal covering his cell window. He has no mental health concerns and was irritable but calm and cooperative with LCSW Cyr. Cyr saw Paschal two additional times that day. He was calm, had low mood, and was frustrated. He denied SI/HI;**

- **11/30/18: LCSW Cyr found him calm and cooperative with slightly frustrated mood and thought process within normal limits. He had no SI/HI;**

- **12/1/18: Dentist Dara Deflono saw Paschal and conducted an oral evaluation;**

- **12/10/18: LCSW Cyr saw Paschal in a case management session. He expressed difficulty coping and reported poor sleep. He asked that he be placed on razor restrictions but be denied SI/HI. His hygiene was well maintained;**

- **121/11/18: APRN Reischerl met with Paschal. He reported poor sleep and Reischerl recorded a recent medication modification to add Wellbutrin, an antidepressant. He had no SI/HI;**

- **12/14/18: LCSW Cyr met with Paschal at his request. He reported stress related to an open adoption matter and legal issues;**

- **12/19/18: LCSW Cyr met with Paschal at his request. He reported recent issues with a call to his family. He also wanted to discuss mental health paperwork from his childhood. He was calm and cooperative and was observed wearing headphones while lying on his cell floor. His thought was logical and goal directed. He did not have any SI/HI;**

- **1/1/19: LCSW Cyr saw Paschal at his cell. He requested self-help materials on personality disorder. He had no immediate mental health concerns;**

- **1/2/19: Aimee Chofay, RN, conducted a mental health follow up. Paschal told her "I'm OK.";**

- **1/3/19: LCSW Cyr met with Paschal. He reported increased stress over court and family issues. He was calm and cooperative. He had no SI/HI;**

- **1/4/19: LCSW Cyr met with Paschal at his request and he told her that the judge in his pending criminal matter wanted him to have a mental health evaluation and he was concerned it this was a negative development. He has no SI/HI;**

- **1/14/19: LCSW Cyr met with Paschal at his request. He reported court and family issues, nightmares, and periodic panic attacks. His mood was stable and he had no SI/HI;**

- **1/19/19: LCSW Cyr saw Paschal briefly to give him clinical materials. He reported that he was working on legal paperwork and he had no current mental health issues;**

- **1/22/19: APRN Reischerl saw Paschal at his request. He denied SI/HI. He reported contact with his family and that he had an upcoming habeas proceeding. He anticipated release in 11 months and wanted mental health planning. He described his depression as an 8.75 on a scale of 10. He reported that he thinks correctional officers try to gas him and that he hears rocks tumbling in the unit but no one else hears them. He agreed to an increase in his antidepressant Prozac.**

- **1/24/19: LCSW Cyr saw Paschal on routine mental health follow up over missing recreation due to his covering his cell widow. He has no SI/HI;**

- **1/25/19: LCSW Cyr saw Paschal at his cell at his request. He had no immediate mental health concerns but he requested materials on focusing;**

- **2/1/19: Paschal was seen by Ellen Durko, RN, and LCSW Cyr. He reported that a correction officer grabbed his buttocks. He had no SI/HI. Cyr later delivered a relaxation packet to him;**

29

- **2/4/19:** LCSW Cyr saw Paschal at his cell where he reported increasing nightmares. He had no immediate mental health concerns, was alert and engaging and his thought process was within normal limits. His mood was stable;

- **2/8/19:** LCSW Cyr saw Paschal and conducted a risk assessment. He complained of sleeplessness. He had covered his cell window and was anxious, loud, and demanding. The unit Captain was present. He vented his frustrations and then uncovered his window and calmed down;

- **2/12/19:** Paschal was in court in Danbury when he experienced a seizure reportedly lasting for about 2 minutes. He was transported to Danbury Hospital by ambulance. A CT scan of his head was negative and he was transported back to NCI;

- **2/12/19:** Paschal was placed on in-cell restraints 1 West cell 102. He told staff he wanted to self-mutilate with the restraints. He was then seen by Pavel Balatka and an order for Behavioral Observation Status (BOS) was obtained via telephone form the doctor on call.

- **2/13/19:** Psychologist Heather Gaw, PsyD saw Paschal while he was on BOS. He denied any intent for self-harm but stated "I was trying to piss off DOC." He was calm, logical, goal directed. He reported chronic suicidality with fluctuating intent, but none currently;

- **2/13/19:** LPC Nathan Grandpre saw Paschal who reported that he had been suicidal since he was 5 years old but that he would not act on it. He was alert and properly oriented;

- **2/14/19:** APRN Reischerl saw Paschal who told her "I am not suicidal. I said I wanted staff to kill me, I am going to trial." He denied SI/HI. He asked to be taken of BOS. He was stable and BOS was discontinued;

- **2/14/19:** Brenda Van Deusen, LCSW, saw Paschal when he returned to NCI form court. He reported that he had seen a video of himself in an incident that previously occurred at Garner Correctional Institution and he was embarrassed by it. He discussed a recent incident in which he had an urge to self-mutilate and said he had not felt that way in several years. He expressed regret over absence from his child during incarceration and guilt over severely assaulting his younger brother several years ago, resulting his brother being placed in an intensive care unit. He had no SI/HI;

- **2/16/19: LCSW Van Deusen was told by Paschal "I'm good." Paschal went to court on this day and he thanked the clinician for checking in on him;**

- **2/17/19: LCSW Van Deusen was told by Paschal "I'm doing good." He had no mental health issues or concerns;**

- **2/20/19: LCSW Cyr conducted a mental health follow up. Paschal reported stress and that he scratched his wrists recently to relieve tension. He was calm and engaging with no SI/HI.**

- **3/3/19: Donna Flores, RN saw Paschal during evening medication pass and he asked her for a band aid. She observed scratches and scabs on his arms. She cleaned them and applied ointment and a bandage.**

- **3/6/19: LCSW Cyr obtained DCF records from Paschal to copy for the psychiatrist to review. Paschal has no immediate mental health concerns. There was no SI/HI.**

- **3/7/19: Cyr did a mental health follow up and noted that Paschal was receiving disciplinary reports as a way of avoiding transfer to AS Phase II. He was clam and engaging without SI/HI.**

- **3/8/19: Nurse Rosenberg noted that paschal was raised to MH4/therapeutic restraint following an incident requiring use of force and chemical agent.**

- **3/8/19: Multiple contacts occurred between Paschal and medical and mental health staff (Cyr and Rosenberg) in which Paschal's presentation varied between yelling, crying, threatening, expressing intent to self-harm, out of control, to quiet and calm, sleeping, talking coherently and oriented. At one point a telephone order for administration of an intermuscular injection of medication was ordered by Dr. Burns after which Paschal's behavior markedly improved.**

- **3/9/19: Nurse Zabik observed paschal sleeping. Later that day he was seen by LCSW Schabot who descried him as angry and irritated but alert, oriented, and stable. She recommended that his mental health classification be returned to MH3. Still later that day Nurse Durko described him as pleasant and cooperative.**

- **3/10/19: Nurse Durko spoke to Pascal who denied any medical issues. She reported that he had a good appetite.**

- **3/10/19: Nurse Fryer reported that Paschal appears to have slept an entire shift and requested that his cell lights be turned off.**

- **3/11/19: LCSW Cyr reported that Paschal told her that he was ready to return to his normal housing unit. She assessed that he had no SI/HI.**

- **3/11/19: Paschal denied any SI/HI to Nurse Rosenberg  but he was angry, pacing in his cell, and yelling things like "I'm supposed to get my due process"; "this is bullshit"; "kill me"; "fuck you"; and "do your fucking job."**

**(Id. ¶7a-7tt).**

**94. On March 12, 2019 APRN Reischerl met with Paschal in the medical unit. Her findings were that he was stable, not suicidal, and appropriate from return to 1 west. He was calm and agreed to a new medication trail of lithium. She concluded that he was properly a MH3 inmate and that his mental health needs could be treated in outpatient setting at NCI. (Id. ¶7uu).**

**95.  Dr. Craig Burns is a psychiatrist. He is the Chief Mental Health Officer of the DOC. He has served as the Chief of Psychiatric Services for DOC, Assistant Chief of Psychiatrist Services at Garner Correctional Institution in Newtown, Connecticut, and as Principal Psychiatrist, Competency Restoration, at Whiting Forensic Division of Connecticut Valley Hospital. He is Board Certified by the American Board of Psychiatry and Neurology in Psychiatry and Forensic Psychiatry. (Burns Declaration, Doc. 25-3 ¶1).**

**96. On March 5, 2019, at the request of the Office of the Attorney General of the State of Connecticut, Dr. Burns interviewed Deja Paschal, who is also known**

as Kyle Lamar Paschal-Barros, at NCI. He spent approximately two and one-half hours interviewing Plaintiff.  He returned to NCI on March 7, 2019 and conducted an additional interview with Mr. Paschal. His objective was to determine if Mr. Paschal's mental health needs may be adequately addressed in his current setting or whether he should be transfer to Whiting Forensic Division of Connecticut Valley Hospital for treatment. Burns advised Mr. Paschal of the reason form his visits and Paschal agreed to meet with and talk to him. (Id. ¶2).

97.  Prior to interviewing Plaintiff Dr. Burns reviewed the following documents provided by the Office of the Attorney General: plaintiff's complaint; plaintiff's memorandum of law in support of request for preliminary injunction; and Order of the Court requiring the defendants in this lawsuit to explain "why the Court should not grant the requested relief in the plaintiff's motion for preliminary injunction (Dkt. No. 7); specifically, an order removing him from solitary confinement at Northern Correctional Institution and transferring him to Connecticut Valley Hospital for psychiatric observation and treatment." (Id. ¶3).

98. Dr. Burns' chart notes document a through interview and assessment of Mr. Paschal, examining him for mood, anxiety, trauma, psychosis, cognitive status, substance abuse history, past psychiatric treatment, medication trials, medical conditions, family history, social history, and current medical problems, medications and treatments. He conducted a mental status examination, and found Paschal to be well groomed, with appropriate hygiene and eye contact. He was oriented to person, place, time and situation. His motor behavior was normal.

Paschal reported that he was depressed. His affect was appropriate with a full range of content and appropriate and spontaneous responses to humor and irony. His speech, thought content, and response to reality testing were all normal. His memory was intact. His attention and concentration were normal. Insight and judgment were assessed to be fair. He denied current suicidality or homicidal ideation. (Id. ¶4 and attached chart note, Exhibit 2 thereto).

99. Dr. Burns found that Plaintiff was appropriately scored as a MH3 at this time and that the then current level of care should be able to take care of Paschal's current needs as a MH 3, and if required due to increased difficulty, Mr. Paschal could be cared for inside of DOC on either a MH4 or MH5 block and returned to a lower level of service need (MH3) when stabilized. (Id. ¶5).

100. Dr. Burns conducted a second interview with Paschal on March 7, 2019 because, "upon review of my initial note two days ago, I realized I had not screened him for the domain related to IMPULSE (Impulse Control Disorders). (Id. ¶4, and chart note, Exhibit 3 thereto). Upon conclusion of that interview Dr. Burns' assessment was unchanged. (Id.). In his opinion "Mr. Paschal is appropriately classified as a Mental Health 3 (MH3). His current level of care should be able to take care of his current needs. If his condition were to exacerbate such that he needed a higher level of care than currently provided, that care can be provided within DOC in a MH4 or MH5 setting with return to a lower level associated with MH3 when stabilized.  He does not need transfer to Whiting Forensic nor does he require Whiting level of care." (Id. ¶5).

101. On March 8, 2019 Mr. Paschal precipitated an incident with custodial staff that resulted in the use of force and use of chemical agent. He was transferred to the medical unit at NCI where he presented as emotionally unstable and expressing suicidal ideation. Dr. Burns was contacted by the mental health staff and he ordered that Paschal be administered an intramuscular injection of Benadryl and Ativan to control his behavior. Her did not order any antipsychotic medication because Paschal's behavior was not related to a psychotic condition. Rather, it was Burns' opinion that the incident was associated with his Borderline Personality Disorder and history of trauma. (Id. ¶6).

102. As a part of Burns' assessment of Paschal he engaged in a lengthy discussion with him about his self-reported past suicide attempts, and in doing so, both directly and indirectly also discussed some self-reported traumatic experiences that may have fueled previous suicide attempts. As identified in Burn's note, past attempts by clinicians to discuss these traumas resulted in "emotional flooding," leaving him temporarily at a loss to manage the feelings that came up as a byproduct of those discussions but, eventually, he was in a better position to manage these emotions. Burns is of the opinion that Paschal would be well served by focusing on developing more in the way of coping skills to support both his institutional adjustment and his general emotional self-regulation. These efforts, as well as any potential medication management that might need to support him, can and are being provided in DOC. As would be expected for a person in crisis with Borderline Personality Disorder, Paschal's

35

classification was appropriately increased to MH5 on March 8, 2019 and he was placed on a suicide watch, to deal with his immediate, although temporary, emotional crisis which was, again, likely triggered by our discussions. Also, not uncommonly seen with individuals with Borderline Personality Disorder, with an opportunity to regroup and marshal the internal resources that he does have, as of March 11, 2019 the mental health staff assessed him as stable and coping without suicidal or homicidal ideation. (Id. ¶6).

103. Dr. Burns was of the opinion that "Mr. Paschal can be adequately treated for his mental health issues within DOC as described in my chart notes from my visits with him on March 5, 2019 and March 7, 2019. From time to time, such as occurred on March 8, 2019, his classification may warrant adjustments to address evolving circumstances. Burns' opinion was that Paschal did not require transfer to Whiting nor did he need Whiting level of care." (Id. ¶7).

104.   Paschal returned to GCI in July 2019 on Phase 2 of AS. On July 10, 2019 a mental health treatment plan was created that focused in his development of coping skill (#2404). The goal was to increase his use of positive and socially acceptable ways of coping. Pieri reviewed and signed off on the treatment plan on July12, 2019. (Ex. 2, Pieri Declaration ¶16).

105.   On July 18, 2019 Paschal was seen by a Licensed Clinical Social Worker (LCSW) (#2401). He was calm and cooperative denied auditory and visual hallucinations and suicidal and homicidal ideation (AH/VH/SI/HI), was goal

directed and in good control. They discussed his frustration with custody staff members and his problem solving techniques. (Id. ¶17).

106.   On July 19, 2019 Paschal met with a LCSW and reported that he was not suicidal and was no longer depressed. He expressed satisfaction with a new medication and was calm, polite, logical, and goal directed. He reported no disturbances in appetite or sleep (#2399, 2408). (Id. ¶18).

107.   On July 29, 2019 he met with a LCSW (#2395). He stated that he was "more mature and more patient now." He asked about the location of treatment places when he was discharged. He was logical, goal directed, and future oriented. He denied VH/AH/SI/HI. There was no evidence of psychosis. He reported that he participates in recreation and socializes with his peers properly. He was using his coping skills and was encouraged to continue to do so. (Id. ¶19).

108.   On July 31, 2019 Paschal saw a LCSW in a crisis intervention (#2390). He had been brought to the wrong courthouse and was upset. He told the clinician that he just needed some time to cool off. He denied any suicidal intent. The clinician allowed him some time alone and when she returned to speak with him he was calm, cooperative, and polite. He was logical and goal directed. He denied VA/HA/HI/SI. Positive coping skills were discussed. There was no evidence of psychosis. (Id. ¶20).

109.   On August 13, 2019 Paschal refused some of his medication by throwing it in the toilet (#2385). He told the nurse he was not required to tell her anything and he refused a mouth check regarding medications. (Id. ¶21).

110.   On August 26, 2019 Paschal met in a private 1:1 session with a LCSW. He was polite and cooperative. He described his mood as "not good." He displayed no evidence of psychosis. He explained that he stopped taking his morning medications because they were not working. He expressed belief that when he refuses medications he gets more attention. He was participating in unit recreation and was seen properly socializing with peers. He reported that he was making effort to utilize coping skills. He wanted to see a psychologist and declined to discuss specific issues with the LCSW. He was seen the next day, August 27, 2019, by Dr. Tung, a psychiatrist. He was calm and cooperative. They discussed his medications and his wish to achieve more remission of symptoms of depression. He denied SI/HI. His thought content was normal. His reported lack of interest in activities and some depression but he also reported no problems sleeping or with his appetite. His energy level was normal. His thought process was logical, his memory was intact, and his insight and judgment were fair. He was assessed as stable. (Id. ¶22).

111. The conditions of Plaintiff's Phase 2 status are similar but somewhat more liberalized than Phase 1.

a.      His cell has a metal door which is kept locked when he was inside.

38

b.     His cell had a button which he can activate at any time which connects to the control pod of the housing unit and alert the unit officers that he is seeking their attention.

c.     Correctional Officers tours RHU every fifteen minutes, 24 hours a day, seven days each week.

d.     During tours it was required that the officers look inside of each cell and actually view the inmate who is inside.

e.     A lieutenant tours RHU twice during each shift for a total of six lieutenant tours per day.

f.     The unit manager an office in RHU and he is frequently on the unit addressing issues with inmates. By policy he is required to tour the unit once each day, Monday through Friday, but he is actually in the unit much more frequently addressing issues with inmates and managing the unit.

g.     A deputy warden tours the unit twice each week.

h.     The Warden tours the unit twice each week.

i.     Each of the individuals touring the unit was available to speak with plaintiff during these tours.

j.     In addition, the GCI Chaplains schedule visits to inmates on AS Phase 2. Additional visits were available at the request of an inmate on Phase 2.

k.    A Correctional Counselor is assigned to and has an office on the unit on first shift five days a week, Monday through Friday. The counselor schedules visits and telephone calls for the inmates, distributes legal mail to the inmates, provides inmates with inmate trust account information, provides copies of documents, arranges for notary services for inmates, and attends to other inmate service needs

l.    Plaintiff's cell is searched on a random basis but not less frequently than twice every seven days or more frequently when warranted. During those searches plaintiff is out of his cell, usually at recreation, or he is escorted to a shower where he is secured until the cell search is completed, at which time he is escorted back to his cell. During the cell search process and escorts Plaintiff has multiple face-to-face contacts with correctional staff.

m.    A mental health social worker is assigned to RHU on first shift, Monday through Friday and is available for intervention with all inmates in RHU, including those on AS Phase 2.

n.    Mental health staff tours the unit at least once during second shift, seven days per week.

o.    A nurse is assigned to the unit on first and second shift, seven days a week. Medical staff tours the unit at least once on third shift, seven days per week.

p.    **Plaintiff was permitted three fifteen minute showers per week. Showers take place outside of his cell and require escort by correctional staff, during which time plaintiff has direct face-to-face contact with the escorting officers.**

q.    **Inmates on AS Phase 2 are handcuffed in front for the first 30 days when out of their cell and in the unit. After 30 days no mechanical restraints are applied to them when they are out of their cells on the unit. Plaintiff had progressed through the 30-day period and by early August was free of restraints when out of his cell on the unit. On August 31, 2019 he covered his cell window and was placed back on handcuffs in front when out of his cell on the unit. That restriction will end on September 7, 2019, at which time he will be free of mechanical restraints when out of his cell on the unit if he continues to comply with unit rules.**

r.    **Phase 2 inmates are permitted one hour of recreation per day, Monday through Friday, in a controlled area. All Phase 2 inmate movement is escorted, including to and from recreation. Outdoor recreation takes place in separate screened enclosures located in a common recreation yard. Phase 2 inmates have recreation together in groups, but are kept physically separated from one another by the screened enclosures. The screened enclosures are made of standard metal chain link fencing that allows inmates to see all of their**

surrounding area and other inmates in adjacent enclosures. Inmates can and do socialize with one another during recreation.

s.   Inmates are able to engage in a variety of physical activities while in this screened recreational enclosures, including walking, running in place, calisthenics, stretching exercises, body weight training exercises, yoga, praying, and other activities appropriate to the space.

t.   Phase 2 inmates may spend up to $30.00 per week on commissary purchases.

u.   Phase 2 inmates may have two 15 minute social telephone calls per week.

v.   Phase 2 inmates may have two 30 minute immediate family non-contact visits per week.

w.   If plaintiff has a question or complaint he can bring it to the attention of the appropriate staff member verbally, when that staff member is in the housing unit, or he could address a written inmate request form to the appropriate staff member.

x.   Plaintiff was also afforded the opportunity to utilize the administrative remedy program, including grievances and health issues, by submitting an Inmate Administrative Remedy request in accordance DOC Administrate Directive 9.6 or 8.9, depending on the particular nature of his issue.

y.      **Plaintiff's cell contains one bunk. He does not have a cellmate. The cell has one mattress, linens, one desk, one chair, one sink with hot and cold running water controlled by the inmate, and a toilet. Plaintiff is permitted to purchase a pillow from commissary but has not done so. The cell had a reflective steel plate mounted to the wall above the sink which functions as a mirror. Paschal also has a mirror in his property that he purchased from commissary. The cell has a light fixture which the inmate may control from within his cell.**

z.      **Plaintiff is allowed to keep books, papers, and a writing utensil in his cell. He is also allowed to keep personal hygiene items in his cell as well as items purchased from the commissary, but such items may not exceed two cubic feet. Paschal meets the DOC definition of an indigent inmate and therefore DOC provided him with a care package every week consisting of soap, deodorant, shampoo, a toothbrush, and toothpaste. He is also regularly provided with toilet paper. DOC also provided him with free social and legal mail and free sheets of paper. Delivery of these items was usually by face-to-face encounter between staff and Paschal.**

aa.    **Plaintiff has a radio and headphones in his cell and is permitted to bring them to and use them in recreation.**

bb.    **Plaintiff is permitted professional legal visits as needed and approved by Unit Administrator or designee.**

cc.   Plaintiff was permitted to send and receive mail the same as general population.

(Exhibit 9, Declaration of Captain Hurdle, ¶¶4-32).

111.   Paschal's current mental health care is reasonable. In the event he should need a higher level of care, that can be provided within GCI as it has an in-patient psychiatric unit. (Ex. 2, Pieri declaration, ¶23).

112.   As a result of the incident at GCI on December 5, 2016 reported to Maiga by Warden Falcone, Plaintiff was criminally charged with three counts of assault on a public service employee in violation of Conn. Gen. Stat. § 53a-167c, and one count to attempt to commit assault of a public service employee in violation of Conn. Gen. Stat. §§ 53a-49 and 53a-167c (Ex. 8, Original Information and Substitute Information, State v. Paschal, DBD-CR17-0154904-S).

113.   After trial by jury Plaintiff was found guilty of one count of attempted assault of public safety employee[1] and was sentenced to seven years incarceration, consecutive, execution suspended after three years, and five years probation with special conditions (Id.).

---

[1] The Court may take judicial notice of the State Judicial Branch Criminal Conviction Case Detail recording Plaintiff's conviction at https://www.jud2.ct.gov/crdockets/CaseDetailDisp.aspx?source=Pending&Key=06349b2d-d26a-40d2-92ea-483552f57c51.

DEFENDANTS
Mark Frayne, Et Al.

WILLIAM TONG
ATTORNEY GENERAL

BY:/s/ Thomas J. Davis, Jr.
Thomas J. Davis, Jr.
Assistant Attorney General
110 Sherman Street
Hartford, CT 06105
Federal Bar #ct17835
E-Mail:  thomas.davis@ct.gov
Tel.:  (860) 808-5450
Fax:  (860) 808-5591

## CERTIFICATION

I hereby certify that on September 4, 2019, a copy of the foregoing was filed electronically.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.  A copy was also sent to the following by regular mail:

Kyle Lamar Paschal-Barros
a/k/a Deja Paschal, Inmate #390410
Garner Correctional Institution
50 Nannawauk Road
P.O. Box 5500
Newtown, CT 06470

/s/ Thomas J. Davis, Jr.
Thomas J. Davis, Jr.
Assistant Attorney General